**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3538-18

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

DEVINN K. DAVIS,

     Defendant-Appellant.

_____

Submitted November 16, 2021 – Decided December 29, 2021

Before Judges Fisher and Currier.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Indictment No. 18-08-1081.

Joseph E. Krakora, Public Defender, attorney for appellant (Michael Denny, Assistant Deputy Public Defender, of counsel and on the brief).

Lori Linskey, Acting Monmouth County Prosecutor, attorney for respondent (Monica do Outeiro, Special Deputy Attorney General/Acting Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from his convictions of fourth-degree resisting arrest, N.J.S.A. 2C:29-2, and fourth-degree aggravated assault, throwing bodily fluid, N.J.S.A. 2C:12-13, and from his sentence. Defendant contends the trial court erred in not instructing the jury on a voluntary intoxication defense and in double counting an aggravating factor while imposing the sentence. Because we conclude, and the State concedes, the court erred in applying aggravating factor eight, we remand for a new sentence. We affirm the convictions.

After a security officer observed defendant leaving a store without paying for two bed comforters, the officer contacted police to report the shoplifting. Ocean Township police officers, Timothy Macom and Mark Powoski, responded. Macom's patrol car was equipped with a mobile video recorder which recorded the incident and was shown to the jury.

Macom spotted defendant walking in a wooded area along the road nearby the store. Defendant was carrying the comforters. When Powoski arrived at the area, he got out of his patrol car and shouted at defendant, demanding him to stop. Although defendant looked over his shoulder in response to Powoski's command, he kept walking. Powoski then followed defendant into the wooded area and saw him cross a stream and drop the comforters on the other side.

2

Macom drove his patrol car to the other side of the wooded area. As defendant came out of the woods, he began running. Macom chased defendant on foot, yelling for him to stop. Defendant did not comply with either officer's commands to stop, but Macom was able to catch up to defendant and arrest him.

As Powoski searched him, defendant said he had drunk some beers but had not been driving. He also stated, "[I]f I knew it was going to get this serious, I swear to God I would never have ran."

Macom testified during the trial that it was evident defendant had been drinking, but the officer did not believe defendant was "under the influence" because he was speaking in complete sentences and Macom was able to understand him. Defendant also answered all of Macom's questions.

Powoski arrived at a similar conclusion. He stated defendant was slurring his speech, smelled of alcohol, and was "wobbly." But he described defendant as coherent, understandable, and oriented. Powoski also stated he did not believe defendant's level of intoxication was high enough to warrant medical concern.

Following the arrest and search, defendant was placed in the back of the patrol vehicle. In a show-up identification, the store's security officer identified defendant as the man seen shoplifting the comforters. Powoski transported

 A-3538-18

defendant back to police headquarters. The officer stated he spoke to defendant during the drive to prevent defendant from falling asleep.

Once at the station, defendant stated he needed to use the bathroom urgently. Powoski bypassed the customary initial booking room search and took defendant directly to the bathroom. As they headed into the bathroom, another officer commented that defendant was "running to the bathroom like a dog." After hearing that, defendant's mood changed from calm to angry and agitated. However, Powoski stated defendant was coherent at all times.

Because defendant refused to cooperate with police during the booking process, he was handcuffed to a bench in the booking area. For an hour and a half, defendant alternated between yelling at the police, sitting calmly, and sleeping. When defendant insisted on laying on the floor, preventing the officers from seeing him on the surveillance cameras, Macom, along with other officers, entered the booking area and asked defendant to sit on the bench. Defendant refused.

As the officers went to lift defendant off the floor, he responded by getting up quickly, telling the officers "he's ready for this," and taking "a swing" at them. Defendant refused to sit down and continued to "verbally badger[]" the officers and threatened to fight them.

4

While defendant was berating the officers, he also requested to go to the hospital, complaining of chest pains. Powoski called for first aid, and Ryan Dowens, an Emergency Medical Technician, responded to the call. Dowens assessed defendant by checking his blood pressure, pulse, breathing rate, and mental status.

During the mental status assessment, Dowens asked defendant "a certain variety of questions . . . to make sure that he[] [was] in the right state of mind, that he could answer the questions appropriately." The questions were: "Where are you right now? What is your birthday? Who the president is, and what happened today leading up to the event?" Dowens testified that defendant answered the questions quickly and appropriately, and Dowens could easily understand him. Dowens testified he did not believe defendant was intoxicated. He explained:

> Again, we asked the four questions, and he answered them quick, and no slurring, no – nothing like that, so that [we] determined that he was not highly intoxicated to where he couldn't remember anything or couldn't make his own decision. So he was still in the right state of mind.

Dowens concluded defendant did not have a life-threatening condition and did not require any treatment before being transported to the hospital to assess his complaints of chest pain. As the officers walked defendant down the hallway

5

toward the ambulance, he continued his verbal abuse of the officers, and spit on four of them as well as the EMTs. As he rode in the ambulance, defendant stated "I spit that, too. How do you like that shit? . . . I meant every bit of that shit. Take that, pussies. Spit on you mother fuckers."

At the conclusion of testimony, during the charge conference, defense counsel requested the court instruct the jury on the voluntary intoxication defense. In denying the request, the trial judge determined the testimony and evidence did not provide a legal basis for giving the charge. The judge stated,

> [I]t's not automatic that they should . . . be given the charge of intoxication because there is some evidence to suggest that your client was intoxicated. "To admit the voluntary intoxication defense as a jury instruction, the [c]ourt must determine whether a reasonable juror would conclude that defendant's faculties were so prostrated that he or she was incapable of forming an intent to commit the crime," that's State v[.] R. T., 411 N.J. Super. 35 [App. Div. 2009].
>
> The standard is rarely met, . . . that's State [v.] R.T., [id. at 47], citing Cameron[,] 104 N.J at 54 [State v. Cameron, 104 N.J. 42, 54 (1986),] [as] holding "that intoxication must be of 'an extremely high level' in order to qualify as a defense."
>
> [Our] Supreme Court in Mauricio at 117 N.J. 402[,] [State v. Mauricio, 117 N.J. 402 (1990)] considered several factors that would support the reasonable juror's finding such as "the quantity of intoxicant consumed, the period of time involved, the actor's conduct as perceived by others, what he said,

how he said it, how he appeared, how he acted, how his coordination or lack thereof manifested itself, any odor of alcohol or other intoxicating substance, the results of any tests to determine blood-alcohol content, and the actor's ability to recall significant events." That's Mauricio, [Id.] at 419.

. . . .

There was testimony from several officers regarding [defendant] having been intoxicated, clearly when he—first came into view in the video tape, it shows [defendant] intoxicated when he was . . . being transported to Ocean Township Police Department, he . . . was falling asleep, Powoski testified that he had to continually ask him to wake up, wake up, wake up. When he got out of the car, [defendant] said, "Hey, man, I gotta pee. I gotta go right now. I gotta pee." He didn't—he certainly had the capacity to hold it in, and not relieve himself in the car, or not lose complete bodily functions or any recollection of—or any of his bodily functions. He held it in, walked inside or made his—scampered inside, and relieved himself in the bathroom.

He was then—he seemed to—his demeanor seemed to have changed from rather docile to now rather hostile, and it appears as if his hostility heightened as a result of reference – what he interpreted as a reference being made to as a dog. He clearly—had a recollection of that.

Probably the most compelling testimony was from EMT Dowens who came in and testified that when . . . [defendant] . . . wanted to go to the hospital, he was having chest pains, and he was very clear about that he was having chest pains, and that he was having trouble breathing. When [the] EMT came, he asked him four

7

questions: Where are you? He asked him when is your birthday? He asked him who the President was? And he asked him what happened today? And that according to EMT Dowens, the responses from [defendant] were . . . quick, and [he] . . . answered . . . all the questions accurately, which . . . EMT Dowens was able to – after having asked those four questions, came to the conclusion saying, "Hey, you know what, he's not giving me any indication based on the answers that he gave to those four questions that I should call the paramedics or have the paramedics come rushing in," and he called off the paramedics.

In fact, he went on further to testify that if [defendant] was highly intoxicated, that he would have, b[een] forcibly, taken to the hospital because he could no longer make these decisions on his own. And so he didn't – according to EMT Dowens, that it didn't appear from his interview and his analysis of the state that [defendant] was in that he was not suffering from alcohol poisoning, that he . . . could go to the hospital via the EMT, and not the paramedics.

Dowens continued to testify that [defendant] was —appeared to be using foul language. . . . I got the impression that based on the testimony of EMT Dowens . . . [defendant] . . . knew his actions[,] that it was clearly a situation where he has no idea where he was, what he was doing, who the President was, or anything along those lines. And that's consistent with what I observed on the videotape. Now the videotape was over two hours long, and I sat through it once outside the presence of the jury, and had the opportunity to sit through it at least another time, broken up in pieces during the course of direct examination and cross-examination, and I—there was nothing, after having seen it multiple times, to suggest that [defendant] was

8

so prostrate from his faculties that intoxication as a defense should be charged.

I simply don't think that it is there. So for reasons stated on the record, I'm not going to charge voluntary intoxication to the jury.

As stated, the jury found defendant guilty of the two fourth-degree charges. Thereafter, in a separate proceeding, the court found defendant guilty of the disorderly persons offense of shoplifting, N.J.S.A. 2C:20-11(b)(1).

During the sentencing hearing, the court found no mitigating factors but found aggravating factors three, N.J.S.A. 2C:44-1(a)(3), six, N.J.S.A. 2C:44-1(a)(6), eight, N.J.S.A. 2C:44-1(a)(8), and nine, N.J.S.A. 2C:44-1(a)(9). In applying aggravating factor eight, the judge stated:

Aggravating factor number 8 I find applies. The defendant committed the offense against a police officer or other law enforcement officer.

At least for the charge of aggravated assault it involved t[w]o Ocean Township police officers that were placing [defendant] into the back of an ambulance after he was processed for the resisting arrest and shoplifting offense, after [defendant] expressed an interest in going to the hospital because he felt ill.

So you know, it appeared as if the officers were trying to comply with [defendant's] wishes, they did not want to just simply write it off as [defendant] just making the story up that he was having heart palpitations and he needed to go to the hospital, they called the EMTs, the EMTs came over, and while

9

taking [defendant] into the back of the ambulance these officers were spit upon.

Defense counsel objected to aggravating factor eight, contending it was double counting because "both the counts of the indictment require elements as . . . they are police officers, and then the aggravating factor is a crime against law enforcement officers."

The court sentenced defendant to a one-year term of imprisonment for each count, along with all required fines and penalties. Defendant was also sentenced to a term of ninety days for the shoplifting offense. After completing a Yarbough[1] analysis, the judge ran the shoplifting sentence concurrently to the resisting arrest sentence. The sentence imposed for the aggravated assault upon a police officer was consecutive.

Defendant presents the following issues on appeal:

> POINT I
> THE TRIAL COURT ERRED WHEN IT REFUSED TO CHARGE THE JURY ON THE DEFENSE OF VOLUNTARY INTOXICATION.
>
> POINT II
> RESENTENCING IS REQUIRED BECAUSE THE TRIAL COURT IMPERMISSIBLY DOUBLE-COUNTED.

---

[1] State v. Yarbough, 100 N.J. 627 (1985).

Our "review of a challenged jury instruction entails not only scrutiny of the charge itself, but an inquiry as to whether an erroneous charge may have affected the trial's result." Washington v. Perez, 219 N.J. 338, 351 (2014). We will not reverse an error in the jury instructions, unless the error produced an unjust result or that it prejudiced substantial rights. Ibid.

Proper jury instructions "are essential for a fair trial." Ibid. (internal quotations omitted) (quoting Velazquez v. Portadin, 163 N.J. 677, 688 (2000)). The instructions explain to the jury the elements of each charged offense, any applicable defenses, and the State's burden to prove guilt beyond a reasonable doubt. State v. R.T., 411 N.J. Super. 35, 46 (App. Div. 2009).

A defendant is entitled to an instruction on a defense if they show "there exists evidence sufficient for a reasonable jury to find in [their] favor." State v. Sloane, 111 N.J. 293, 303 (1988) (quoting Mathews v. United States, 485 U.S. 58, 63 (1988)). Voluntary "intoxication of the actor is not a defense unless it negates an element of the offense." N.J.S.A. 2C:2-8(a). As our Supreme Court stated in Cameron, "N.J.S.A. 2C:2-8(a) permits evidence of intoxication as a defense to crimes requiring either 'purposeful' or 'knowing' mental states but it excludes evidence of intoxication as a defense to crimes requiring mental states of only recklessness or negligence." State v. Cameron, 104 N.J. 42, 52 (1986).

11

In order to qualify as a defense negating an element of the offense, "the intoxication must be of an extremely high level." Id. at 54.

> [I]t is not the case that every defendant who has had a few drinks may successfully urge the defense. The mere intake of even large quantities of alcohol will not suffice. Moreover, the defense cannot be established solely by showing that the defendant might not have committed the offense had he been sober. What is required is a showing of such a great prostration of the faculties that the requisite mental state was totally lacking. That is, to successfully invoke the defense, an accused must show that he was so intoxicated that he did not have the intent to commit an offense. Such a state of affairs will likely exist in very few cases.
>
> [Ibid. (quoting State v. Stasio, 78 N.J. 467, 495 (1979)) (alterations in original) (internal citations omitted).]

Therefore, for a court to give the jury the involuntary intoxication charge, it must find a rational basis to conclude the defendant's faculties were so prostrated that the defendant was incapable of forming the required mental state to prove they committed the offense. State v. Mauricio, 117 N.J. 402, 418-19 (1990). The court may consider several factors in making its determination of whether a defendant is intoxicated to the point that there was a "prostration of faculties," including:

> the quantity of intoxicant consumed, the period of time involved, the actor's conduct as perceived by others (what he said, how he said it, how he appeared, how he acted, how his coordination or lack thereof manifested

12

itself), any odor of alcohol or other intoxicating substance, the results of any tests to determine blood-alcohol content, and the actor's ability to recall significant events.

[Cameron, 104 N.J. at 56.]

Here, the trial court carefully considered the evidence and concluded defendant had not shown he was so intoxicated that he lacked the mental capacity requisite to commit the charged offenses. The court acknowledged that at the time of the arrest defendant was intoxicated. Defendant claimed to have consumed five beers and the officers noticed he was slurring his speech, was wobbly on his feet, and smelled of alcohol. The officer also had to keep him awake during the drive to the station.

However, the court found Dowen's testimony the most compelling and weighed against providing the defense instruction. After defendant sat for an hour and a half in the booking area, he complained of chest pains, causing police to contact Dowens. While examining defendant, Dowens asked him four basic questions: "Where are you right now? What is your birthday? Who the president is, and what happened today leading up to the event?" Defendant was able to respond to the questions, answering quickly, appropriately, and in a way that could be easily understood. Furthermore, defendant was not slurring his words, nor was he confused by the questions. Based on defendant's answers to these

questions and his entire conversation with defendant, Dowens believed defendant was not intoxicated and could make his own decisions.

The court gave substantial weight to this testimony in deciding not to instruct the jury on the voluntary intoxication defense. As a trained professional who evaluated defendant, the testimony Dowens provided satisfied the court that defendant was not so intoxicated to lack the requisite mental state.

At all times, defendant was oriented, answered the officers' questions appropriately, had various strategies to avoid the booking process and get transported to the hospital, and recalled the events that led to his arrest. We discern no error in the court's determination that defendant was not so intoxicated to reach a prostration of faculties. Therefore, he was not entitled to the voluntary intoxication defense instruction.

In turning to defendant's assertion that the court impermissibly found aggravating factor eight while imposing sentence, we agree and remand for resentencing.[2]

Under N.J.S.A. 2C:44-1, "sentencing courts are cautioned to avoid 'double counting' circumstances that the Legislature has already incorporated as an element of the offense." State v. Lawless, 214 N.J. 594, 608 (2013).

---

[2] The State concedes a remand for resentencing is appropriate.

Elements of a crime, including the elements that establish the grade of the offense, cannot be used as aggravating factors for sentencing for that particular crime. Ibid. See also State v. Carey, 168 N.J. 413, 425-26 (2001); State v. Pineda, 119 N.J. 621, 627 (1990); Yarbough, 100 N.J. at 633.

We addressed a similar set of circumstances in State v. Link, 197 N.J. Super. 615 (App. Div. 1984). There, the defendant was convicted of aggravated assault upon a police officer. Id. at 618. During sentencing, the trial judge imposed a term of five years of imprisonment with a parole disqualifier period, which was the maximum sentence for the offense. Id. at 619. The judge departed from the presumptive sentence of four years of imprisonment for the third-degree crime because the assault was committed against a police officer. Ibid. This court found that the "trial judge violated the sentencing strictures of the Code when he based his sentence, more severe than the presumptive one, upon the same fact that the Legislature has determined would be adequately taken into account by the presumptive sentence." Id. at 620.

Defendant's charges both have elements of the victims' status as law enforcement officers. Therefore, under Link, the trial court was not permitted to consider aggravating factor eight in its sentencing determination.

On remand, the trial court should be further guided by Link, where this court stated, "We are mindful of defendant's extensive criminal record and the judge's concern that defendant poses a threat of continuing criminal conduct. We therefore do not suggest that the sentence imposed would be excessive if the judge determines that it is warranted by aggravating factors other than the victim's status." Link, 197 N.J. Super. at 621. The trial judge here found additional aggravating factors and noted a criminal record spanning continuously over twenty years. Therefore, although a remand is necessary to correct the double counting, the trial court may conclude the sentence was not excessive given the additional aggravating factors.

Affirmed in part and remanded for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3538-18